# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

OWNER-OPERATOR INDEPENDENT, )
DRIVERS ASSOCIATION, INC., et al., )
                              )
       Plaintiffs, )
                              )    **No. 03 C 7869**
    v.                       )
                              )    **Mag. Judge Michael T. Mason**
BULKMATIC TRANSPORT COMPANY, )
                              )
       Defendant. )

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Plaintiffs Owner-Operator Independent Drivers Association, Inc., et al. ("plaintiffs") filed a three-count complaint against defendant Bulkmatic Transport Company ("defendant" or "Bulkmatic") pursuant to 49 U.S.C. §§ 14102 and 14704. In their complaint, plaintiffs allege that defendant violated the federal Truth-in-Leasing regulations, 49 C.F.R. Part 376, which govern the leases between defendant and individuals who lease their trucking equipment to defendant. Plaintiffs filed a motion for partial summary judgment on the issue of liability on Count III. Bulkmatic filed a cross-motion for summary judgment on all three counts of plaintiffs' complaint. For the reasons set forth below, plaintiffs' motion for partial summary judgment is granted and defendant's cross-motion for summary judgment is denied.

## BACKGROUND

The Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. §§ 10101, *et seq.* ("ICCTA"), transferred the motor carrier regulatory functions previously

vested in the Interstate Commerce Commission to the Department of Transportation ("DOT") and the Surface Transportation Board. *See* 49 U.S.C. § 13501. The federal Truth-in-Leasing regulations ("the regulations"), 49 C.F.R. Part 376, govern the leases between motor carriers and owner-operators of trucks. These regulations were initially promulgated pursuant to 49 U.S.C. §§ 13301 and14102. With the Motor Carrier Safety Improvement Act of 1999, Congress transferred to the new Federal Motor Carrier Safety Administration ("FMCSA") all "duties and powers related to motor carriers or motor carrier safety vested in the Secretary [of Transportation] by chapters . . . 133 through 149 . . . ." 49 U.S.C. § 113(f)(1). The Secretary thereby, in relevant part, delegated his authority over the federal leasing regulations to FMCSA. *See* 49 C.F.R. §§ 1.73(a)(2), (6), (8).

Bulkmatic is a regulated motor carrier that transports property in interstate commerce under authority issued by the DOT. It does so utilizing tractors and driving services leased from owner-operators (*i.e.*, independent truckers). Plaintiff Owner-Operator Independent Drivers Association, Inc. ("OOIDA") is an association, some of whose owner-operator members (including the individual plaintiffs) have leased their trucking equipment, with a driver, to defendant. Defendant has entered into lease agreements with the individual plaintiffs.

In Count I of the complaint, plaintiffs allege that the subject lease agreements do not contain all of the provisions, or the precise wording, required by the applicable leasing regulations. *See* 49 C.F.R. § 376.12. In Count II of the complaint, they allege that Bulkmatic failed to provide rated freight bills to owner-operators on request, in violation of 49 C.F.R. § 376.12(g). In Count III, plaintiffs allege that Bulkmatic

understates its gross revenue before calculating plaintiffs' percentage-of-revenue compensation, thus underpaying them, in violation of 49 C.F.R. § 376.12(d) and (g).

**UNDISPUTED FACTS**[1]

Bulkmatic transports various products for third party shippers in bulk tank trailers. Included among the products transported in Bulkmatic tank trailers are food products such as flour, sugar and grain; and non food products such as chemicals and plastics. Bulkmatic owns the tank trailers but sometimes leases tractors and drivers from owner-operators, who drive the freight to its destination.

Each individual plaintiff has entered into a "Lease Agreement" with Bulkmatic under which the owner-operator provides trucking equipment and driving services to Bulkmatic. Bulkmatic uses a standard form Lease Agreement which is materially identical for all owner-operators. Bulkmatic drafts the Lease Agreements.

Each Lease Agreement contains the following provisions:[2]

> LESSOR does hereby lease to LESSEE the following motor vehicle(s) equipment, with or without driver . . . .
> (Lease A.1).
>
> LESSEE shall pay to LESSOR for the use of said equipment and driver, or for equipment alone, if no driver is being leased, as follows:
> XX% of gross revenue[3]
> (Lease D.1).

---

[1] The facts in this section are derived from the parties' Rule 56.1 statement of facts or the exhibits attached thereto. Unless otherwise specified, the facts in this section are undisputed.

[2] Plaintiffs are the LESSORS and Bulkmatic is the LESSEE under the Lease Agreements.

[3] The percentage of gross revenue specified in each Lease Agreement ranges from 62 percent to 67 percent.

LESSEE agrees to pay LESSOR said net earnings (less deductions) after LESSOR has submitted the necessary delivery documents.
(Lease D.2(a)).

LESSEE shall provide LESSOR with a computerized report verifying rates, gross revenues, and loads used to compute payments to LESSOR hereunder.  In addition, LESSEE shall furnish to LESSOR a copy of the rated freight bill upon request.
(Lease D.3(b)).

With respect to truck earning [sic], LESSEE shall furnish weekly to LESSOR a cartage sheet which itemizes the total earnings, expenses and deductions.
(Lease D.3(c)).

LESSOR agrees to pay all of the operating expenses of the above equipment, including but not limited to:
- All tolls and ferries
- All detention and accessorial charges

(Lease E.1, in pertinent part).

LESSOR hereby authorizes LESSEE to deduct from LESSOR's cartage checks covering truck earnings any sums of money that shall be due and owing to LESSEE from LESSOR.  The items which may be unilaterally deducted from the LESSOR's settlement check, having been initially paid for by LESSEE and/or its affiliated companies, are as follows, provided that a written explanation and itemization be delivered to LESSOR before any deductions are made:
- Maintenance and repair.
- Preload charges.

(Lease F.3 and F.6).

After the freight reaches its destination, Bulkmatic submits a freight invoice to the shipper-customer.  The freight invoice states the full amount owed to Bulkmatic by the shipper.  Bulkmatic bills the shippers for each shipment by forwarding an invoice either in paper form or electronically.

Shippers are charged by Bulkmatic for transportation services by various rates

4

including by flat rate, by hundred weight, by ton weight and by per mile rate. The freight invoices include the charge for the actual transportation of freight from its point of origin to its destination (the "line haul"). The line haul rates vary from shipper to shipper, and are negotiated with each individual shipper. The line haul rates may change within months, depending upon competition and other factors. A shipper may have different line haul rates, depending on the freight's point of origin, its destination and other factors.

The freight invoices also include charges for services other than transporting the product, such as: transfer charges (relating to loading the tank/trailer), sealing charges, cleaning charges, sifting charges, inspection charges, dedicated trailer fees, non-use fees, extra equipment charges, fuel surcharges, tolls and detention (waiting time). Charges for services other than transporting the product are sometimes referred to as "accessorial" charges.

Some of the accessorial charges are for services provided by Bulkmatic itself, while others are for services provided by third parties or by owner-operators. When these accessorial services are performed by third parties, Bulkmatic pays the third parties. The accessorial services may also be performed by Bulkmatic employees, who are paid by Bulkmatic. Bulkmatic does not compensate owner-operators for accessorial services performed by Bulkmatic employees or by third parties that do not involve the use of owner-operators' driving services or equipment.

Instead, Bulkmatic calculates owner-operator compensation as a percentage of the amount billed to the shipper that is attributable to the use of the owner-operators' equipment and driver services. Accordingly, when owner-operators perform the

accessorial services, they are paid a percentage of the corresponding accessorial charges billed to the shipper. When owner-operators do not perform the accessorial services, they are not paid a percentage of the corresponding accessorial charges billed to the shipper.

For example, loading the trailer, represented by the "transfer charge," is sometimes done by the owner-operator, other times by Bulkmatic or a third party. Loads that originate out of Bulkmatic's Bronx, New York terminal, for instance, are pre-loaded by Bulkmatic, before the owner-operators arrive with their leased tractors. When an owner-operator loads the trailer, he receives a percentage of the transfer charge. When the owner-operator does not load the trailer, he is not paid a portion of the transfer charge.

At times, Bulkmatic also bills shippers a "fuel surcharge." When there is an increase in fuel prices, Bulkmatic bills the shipper a percentage (ranging from approximately 2% to 30% of the delivery charge, depending upon the varied price of diesel fuel) to account for that increase. Bulkmatic, in turn, reimburses the owner-operators the full amount of the fuel surcharge.

Whether a shipper is charged by flat rate, by hundred weight, by ton rate or by per mile rate, some or all of the services provided may be rolled into the rate charged and not itemized on an invoice. Invoices from Bulkmatic to a shipper may show one undivided total charge per load transported or may included a separate charge for specified items which is then totaled on the invoice. The same amount may be charged for transporting a load on the same delivery route regardless of whether certain services are provided every time a load is carried over that route. For example, a tank wash may

be performed only when product build up in the tank requires that it be cleaned.  The account receivable for each shipment reported in Bulkmatic's accounting system is recorded as one total invoice amount which includes all charges billed on the invoice for the shipment.

Bulkmatic compensates its owner-operators on a weekly basis.  Bulkmatic provides the owner-operators with a settlement statement that sets out their compensation for each individual shipment.  Each invoice for a shipment moved by an owner-operator can be linked to an owner-operator settlement by a unique identifying number.  The settlement statements contain the following information: (1) the load number and date; (2) the line haul rate; (3) the fuel surcharge; and (4) all other accessorial charges relating to the use of the owner-operator's equipment and driver services.

According to Bulkmatic, several plaintiffs purportedly admitted that they were to be compensated based on the use of their equipment and driving services.  In an answer to Interrogatory No. 19, plaintiff Simon Jamel indicated that "gross revenue" means "the amount that Bulkmatic charges the customer for anything that I was involved with."  Mr. Jamel testified that he agrees there is a connection between "gross revenue" and the services he provides.  Plaintiffs David Paul, Nelson Hernandez and John Robertson testified that they were not seeking payment for services that they did not perform.

In contrast, according to plaintiffs, their understanding of the term "gross revenue" is consistent with its common usage - all sums associated with charges to the shipper.  Plaintiffs Peter Mango, John Smith and Thomas Taylor testified that a tank

wash should be included in gross revenue because it is part of the total amount charged to the shipper. They also participate by bringing the trailer to the tank wash. Additionally, in response to the same interrogatory discussed above, the remaining plaintiffs all indicated that they understood "gross revenue" to be the total amount Bulkmatic charges the shipper.

Bulkmatic submitted the affidavit of Kenneth M. Siegel, who has extensive experience in the trucking industry. Mr. Siegel states that for several decades, it has been a standard practice within the trucking industry to state the compensation to be paid owner-operators under a lease agreement with motor carriers in terms of a percentage of the carrier's gross revenue. Mr. Siegel also states that it has been a general practice in the trucking industry for carriers to calculate the compensation to be paid an owner-operator under a lease agreement as a percentage of the revenues derived by the carrier for services performed by the owner-operator, including the use of the owner-operator's vehicle and driving services. Mr. Siegel further states that it has been a general practice in the trucking industry for carriers to exclude from calculations of owner-operator compensation revenues derived as a result of services performed by the motor carrier. The excluded items include matters such as: trailer cleaning, transfer services, sealing charges, insurance surcharges, security surcharges, special billing or invoice services, late payment fees or penalties or penalties assessed against a shipper, or similar items which the service is performed, the expense incurred, or the risk assumed by the motor carrier and not the owner-operator.

**LEGAL ANALYSIS**

Summary judgment is proper when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party has the burden of demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323. "A genuine issue of material fact exists only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Alexander v. Dept. of Health and Family Services*, 263 F.3d 673, 680 (7th Cir. 2001). When making this determination, we review the record in the light most favorable to the nonmovant, and draw all reasonable inferences in his favor. *Id.* However, once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v. Kilquist*, 833 F.2d 639, 642 (7th Cir. 1987). Federal Rule of Civil Procedure 56(c) "mandates summary judgment when the nonmoving party fails to establish the existence of an element essential to its case and on which that party will bear the burden of proof at trial." *Jefferson v. City of Chicago*, 2000 U.S. Dist. LEXIS 22081, *10 (N.D. Ill. 2000).

## I.  Plaintiffs' Motion for Partial Summary Judgment On Count III

Plaintiffs have moved for partial summary judgment as to liability on Count III. In order to resolve plaintiffs' motion for summary judgment, this Court must interpret the Lease.[4] As an initial matter, because the Lease must comply with the federal

---

[4] Because Bulkmatic uses a standard form Lease Agreement which is materially identical for all owner-operators, we will simply refer to the contract as "the Lease."

regulations applicable to authorized motor carriers as set forth in 49 C.F.R. §376.12, this Court finds that it should be construed in accordance with federal common law and general rules of contract interpretation. *See Turner v. Miller Transporters, Inc.*, 852 So. 2d 478, 485 (La. Ct. App. 2003) (noting that leases between regulated carriers and owner-operators are subject to federal law and further finding that claims for damages related to a violation of 49 C.F.R. § 376.12 fall under the aegis of federal law rather than state law); *see also, Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 419 (7th Cir. 1998).

When there are no triable issues of fact, the Seventh Circuit has held that "contract interpretation is a subject particularly suited to disposition by summary judgment." *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1389 (7th Cir. 1993) (quoting *Metalex Corp. v. Uniden Corp. of America*, 863 F.2d 1331, 1333 (7th Cir. 1988)). When a court interprets a written contract, it must determine whether the contract is ambiguous or unambiguous as a matter of law. *Ryan v. Chromalloy American Corp.*, 877 F.2d 598, 602 (7th Cir. 1989). Where the words of a contract are not ambiguous, they are to be given their ordinary meaning. *Harry F. Chaddick Realty, Inc. v. Maisel*, 762 F.2d 534, 537 (7th Cir. 1985). "A term is ambiguous if it is subject to reasonable alternative interpretations." *Hickey*, 995 F.2d at 1389 (quoting *Taylor v. Continental Group*, 933 F.2d 1227, 1232 (3rd Cir. 1991)). A court may consider extrinsic evidence to resolve an ambiguity only after it has ruled that a contract is ambiguous. *Id.*; *Ryan*, 877 F.2d at 602. Therefore, when a motion for summary judgment requires interpretation of a contract, "the district court must determine (1) if the contract is ambiguous or unambiguous and (2) if it is ambiguous, whether after consideration of the extrinsic evidence, there are any triable issues of fact." *Hickey*, 995 F.2d at 1389.

We begin by analyzing whether the Lease is ambiguous. In Count III, plaintiffs allege that Bulkmatic reduces and understates the gross revenue actually received from the shipper on the settlement statements provided to its owner operators before calculating owner-operator compensation. According to plaintiffs, Bulkmatic underpays its owner-operators by an amount equal to the amount of the reduction in gross revenue times the percentage of gross revenue specified in each lease. Plaintiffs claim that Bulkmatic's conduct violates 49 C.F.R. § 376.12(d) and (g).

Section 376.12(d) provides:

> The amount to be paid by the authorized carrier for equipment and driver's services shall be clearly stated on the face of the lease or in an addendum which is attached to the lease. Such lease or addendum shall be delivered to the lessor prior to the commencement of any trip in the service of the authorized carrier. An authorized representative of the lessor may accept these documents. The amount to be paid may be expressed as a percentage of gross revenue, a flat rate per mile, a variable rate depending on the direction traveled or the type of commodity transported, or by any other method of compensation mutually agreed upon by the parties to the lease. The compensation stated on the lease or in the attached addendum may apply to equipment and driver's services either separately or as a combined amount.

Section 376.12(g) provides in pertinent part:

> When a lessor's revenue is based on a percentage of the gross revenue for a shipment, the lease must specify that the authorized carrier will give the lessor, before or at the time of settlement, a copy of the rated freight bill or a computer-generated document containing the same information, or, in the case of contract carriers, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill.

Plaintiffs argue that Bulkmatic's undisclosed reductions to gross revenue are inconsistent with the regulation's requirement that owner-operator compensation must be clearly stated on the face of the lease. *See* 49 C.F.R. § 376.12(d). Plaintiffs contend

that the compensation provision in section D.1, which provides that Bulkmatic pay the owner-operators a certain percentage of gross revenue, is not qualified or modified in any manner by the Lease or an addendum. Plaintiffs further argue that the Lease does not specify any exclusions from gross revenue prior to calculation of owner-operator compensation.

In response to plaintiffs' arguments, Bulkmatic contends that the Court must read the Lease as a whole. More specifically, Bulkmatic argues that the clear and unambiguous meaning of all of the Lease terms requires Bulkmatic to compensate plaintiffs based on a percentage of gross revenue derived from the use of their trucking equipment and driver services. Indeed, Bulkmatic considers gross revenue to include only amounts charged to the shipper that relate to the use of the owner-operator's trucking equipment and driver services.

Bulkmatic further contends that several Lease provisions demonstrate that plaintiffs are wrong in asserting that gross revenue is not qualified or modified in the Lease. Bulkmatic relies on the following provisions: A.1, D.1, D.2(a), D.3(b), D.3(c), E.1, F.3 and F.6.[5] According to Bulkmatic, these provisions demonstrate unambiguously that plaintiffs' compensation is to be tied to the use of their trucking equipment and driver services.

Simply put, the Court disagrees with Bulkmatic's interpretation of the Lease. Read as a whole, the Lease does not unambiguously tie owner-operator compensation to the use of their trucking equipment and driver services. The Lease states that

_____

[5] Each of these provisions is set forth in the Undisputed Facts section of this opinion.

Bulkmatic shall pay the owner-operator "for the use of said equipment and driver, or for equipment alone, if no driver is being leased, as follows: XX% of gross revenue." However, the Lease does not define "gross revenue" nor does it specifically state which items, if any, may be excluded from gross revenue before calculating owner-operator compensation.

Plaintiffs interpret "gross revenue" to mean the total amount charged to the shipper on the invoice for a shipment. This is a reasonable interpretation and consistent with the generally accepted meaning of the phrase. *See City of Dallas v. FCC*, 118 F.3d 393, 395 (5th Cir. 1997) (stating that "the phrase 'gross revenue' has a generally accepted meaning: unless expressly limited by the terms of a statute, regulation or contract, gross revenues means all amounts received from operation of a business, without deduction.") (citing *Veterans Rehabilitation Center, Inc. v. Birrer*, 170 Mont. 182, 185, 551 P.2d 1001, 1003 (1976) (noting that "generally the term 'gross revenue' means gross receipts of a business before deduction for any purpose except those items specifically exempted."); *Public Service Co. of Colorado v. Denver*, 153 Colo. 396, 403, 387 P.2d 33, 36 (1963)(same)); *see also, Merriam-Webster's Collegiate Dictionary*, 514 (10th Ed. 1999) (defining the adjective "gross" as "consisting of an overall total exclusive of deductions").

However, the Court could also interpret "gross revenue" to mean the total amount charged to the shipper less the deductions set forth in section F of the Lease. Under the terms of the Lease, items that are initially paid for by Bulkmatic and clearly set forth in section F may be deducted from the owner-operator's settlement check. That being said, it remains unclear when those items are to be deducted. Section F does not state

13

that those items are to be deducted from gross revenue prior to calculating owner-operator compensation.

Furthermore, it is unclear whether all of the accessorial charges that Bulkmatic deducts before calculating an owner-operator's compensation fall within section F of the Lease. For instance, contrary to Bulkmatic's argument, it is not clear to this Court that tank washes or cleaning charges fall within the term "Maintenance and Repair" as that phrase is not defined in the Lease. Additionally, when Bulkmatic charges shippers for tank washes that were not actually performed, such a charge cannot be considered an item that was "initially paid for" by Bulkmatic under section F.

Section E.1 adds another layer of confusion. That section of the Lease identifies operating expenses for which the owner-operators are responsible. However, the Lease does not state that Bulkmatic may charge the shipper for such items and reduce owner-operator compensation by that amount. For example, section E.1 states that the owner-operator agrees to pay tolls. Mr. Flaxmayer, Senior Vice President of Finance for Bulkmatic, testified about several customer invoices and corresponding settlement statements. One of those invoices listed a rate for the shipment, a transfer charge, a cleaning charge, tolls and a fuel surcharge. Mr. Flaxmayer explained that the amount for the tolls was not reflected on the corresponding settlement statement because tolls are the owner-operator's responsibility under section E of the Lease. Based on his testimony, it appears that owner-operators pay the tolls out of pocket, Bulkmatic charges the shippers for the tolls and then reduces gross revenue by the amount charged for the tolls prior to calculating an owner-operator's compensation. The Lease does not provide for a reduction of gross revenue for items enumerated in section E.

14

Another confusing aspect of the Lease is the fact that many of its terms and phrases are not defined and they are not used consistently throughout the Lease.  For instance, in section D.1, the Lease states that owner-operators are to be paid "XX% of gross revenue."  The very next paragraph of the Lease, in section D.2(a), states "LESSEE agrees to pay LESSOR said net earnings (less deductions, if any) no later than fifteen (15) days after LESSOR has submitted the necessary delivery documents." It is inconsistent and confusing to refer to owner-operator compensation in terms of "gross revenue" in one paragraph and then refer to it in terms of "net earnings (less deductions, if any)" in the next paragraph.  Moreover, the phrase "net earnings (less deductions, if any)" makes no sense.  The phrase "net earnings" implies that deductions have already been taken.  Thus, it is unclear what the drafter of this Lease meant by the phrase "net earnings (less deductions, if any)."  The Lease also refers to "truck earnings" in sections D.3(c) and F.  The Court has no idea what "truck earnings" means and the Lease does not define the phrase.  The Lease also interchangeably uses the phrases "settlement checks" and "cartage checks."  Simply put, the Lease is unclear as a result of these inconsistencies and undefined terms and phrases.

Based on this Court's review of the Lease as a whole, we find that the amount to be paid by Bulkmatic for the owner-operators' equipment and driver services is not clearly stated on the face of the Lease.  Accordingly, the Lease violates 49 C.F.R. § 376.12(d).  Moreover, we find that the Lease is ambiguous because the amount to be paid to the owner-operators is subject to reasonable alternative interpretations.  *Hickey*, 995 F.2d at 1389.

Because the Court has determined that the Lease terms relating to owner-

operator compensation are ambiguous, it is appropriate to consider extrinsic evidence. *Id.* Bulkmatic asks the Court to rely on the testimony of a few plaintiffs, who purportedly admitted that they were to be compensated based on the use of their equipment and driving services. In an answer to an interrogatory, plaintiff Simon Jamel indicated that "gross revenue" means "the amount that Bulkmatic charges the customer for anything that I was involved with." Mr. Jamel testified that he agrees there is a connection between "gross revenue" and the services he provides. Plaintiffs David Paul, Nelson Hernandez and John Robertson testified that they were not seeking payment for services that they did not perform.

Plaintiffs argue that the subjective understanding of the plaintiffs is not relevant to interpreting the terms of the Lease. Furthermore, plaintiffs contend that their understanding of the term "gross revenue" is consistent with its common usage - all sums associated with charges to the shipper. Plaintiffs Peter Mango, John Smith and Thomas Taylor testified that a tank wash should be included in gross revenue because it is part of the total amount charged to the shipper. Additionally, in response to the same interrogatory Mr. Jamel answered, the remaining plaintiffs all indicated that they understood "gross revenue" to mean the total amount Bulkmatic charges the shipper.

The plaintiffs' subjective understanding of the Lease does not hold much weight with this Court. First of all, the Lease is difficult for this Court to interpret. We cannot expect a layperson to interpret the terms of a complex and in this case, confusing Lease. Second, Bulkmatic's reliance on a few plaintiffs' subjective understanding of the phrase "gross revenue" does not aid this Court in interpreting the Lease, particularly because the majority of the plaintiffs understand "gross revenue" to mean the total

amount Bulkmatic charges the shipper.

Next, Bulkmatic asks the Court to look to evidence of standard practices in the trucking industry. Bulkmatic submitted the affidavit of Kenneth M. Siegel, who has extensive experience in the trucking industry. Mr. Siegel states that for several decades, it has been a standard practice within the trucking industry to state the compensation to be paid owner-operators under a lease agreement with motor carriers in terms of a percentage of the carrier's gross revenue. Mr. Siegel also states that it has been a general practice in the trucking industry for carriers to calculate the compensation to be paid an owner-operator under a lease agreement as a percentage of the revenues derived by the carrier for services performed by the owner-operator, including the use of the owner-operator's vehicle and driving services. Mr. Siegel further states that it has been a general practice in the trucking industry for carriers to exclude from calculations of owner-operator compensation revenues derived as a result of services performed by the motor carrier.

While the Court has considered Mr. Siegel's affidavit regarding industry practice, it simply does not persuade us to adopt Bulkmatic's interpretation of "gross revenue." This Court has already found that the Lease violates 49 C.F.R. § 376.12(d) because the amount to be paid to the owner-operators is not clearly stated on the face of the Lease. It makes little sense for this Court to interpret the phrase "gross revenue" to include only amounts charged to the shipper that relate to the use of the owner-operators' trucking equipment and driver services. Such an interpretation would render § 376.12(d) pointless because Bulkmatic would be permitted to violate the regulation by drafting a Lease with ambiguous compensation provisions yet have those same ambiguous terms

17

interpreted in its favor.[6]

One of the concerns underlying the Truth-in-Leasing regulations was the uneven bargaining power of the owner-operators. Indeed, in *Owner-Operator Indep. Drivers Ass'n v. New Prime, Inc.*, 398 F.3d 1067, 1070 (8th Cir. 2005), the Eighth Circuit stated:

> A review of the development in the Truth in Leasing regulations indicates that they were intended to remedy disparities in bargaining positions between independent owner operators and motor carriers. The regulations were originally developed by the Interstate Commerce Commission (ICC), and the ICC's notice of proposed rulemaking noted "the Commission's deep concern for the problems faced by the owner-operator in making a decent living in his chosen profession." 42 Fed. Reg. 59,984 (Nov. 23, 1977). In its notice of proposed final rules, the ICC said that some of its rulemaking objectives were "to eliminate or reduce opportunities for skimming and other illegal or inequitable practices; and to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry." 43 Fed. Reg. 29,812 (July 11, 1978).

This Court declines to interpret the Lease in a manner that would circumvent the very regulations that were enacted to protect the owner-operators.

Moreover, it is well settled that ambiguities in a contract are to be construed against the drafter. *Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 306 (7th Cir. 1992) (stating that "[t]he rule of *contra proferentum* dictates that ambiguities in a contract be construed against the drafter."); *Farmers Auto. Ins. Ass'n v. St. Paul Mercury Ins. Co.*, 482 F.3d 976, 977 (7th Cir. 2007). Bulkmatic drafted the Lease. If Bulkmatic intended to pay owner-operators a certain percentage of revenues derived

---

[6] For the same reason, it make little sense to interpret the Lease as a whole as limiting owner-operator compensation to a percentage of the revenue derived solely from their equipment and driver services. Again, such an interpretation would allow Bulkmatic to violate § 376.12(d) by drafting a Lease with ambiguous compensation provisions yet have the same ambiguous and confusing Lease interpreted in its favor.

18

solely from the use of the owner-operators' trucking equipment and driver services, the Lease could have and should have specifically stated as much. However, the Lease does not state that owner-operator compensation is limited to a percentage of revenues generated from their equipment and driver service. For all of these reasons, we decline to interpret "gross revenue" in the manner suggested by Bulkmatic.

Instead, the Court adopts plaintiffs' interpretation of the phrase "gross revenue." In other words, the Court interprets "gross revenue" to mean the total amount charged to the shipper on the invoice for a shipment. As stated above, this interpretation of "gross revenue" is consistent with the generally accepted meaning of the phrase. It is also consistent with how the phrase is commonly defined by the courts. *See City of Dallas*, 118 F.3d at 395; *Veterans Rehabilitation Center*, 170 Mont. at 185; *Public Service Co. of Colorado*, 153 Colo. at 403. Furthermore, again, the rule of *contra proferentum* requires that contracts, if ambiguous, be construed against the drafter. *Farmers Auto.*, 482 F.3d at 977.

Based on the foregoing, plaintiffs' motion for partial summary judgment as to liability on Count III is granted. Because the Lease violates 49 C.F.R. § 376.12(d), summary judgment in plaintiffs' favor is warranted.[7]

## II.      Bulkmatic's Motion for Summary Judgment On Count III

For the reasons set forth above, Bulkmatic's motion for summary judgment on

---

[7] The entry of partial summary judgment as to liability on Count III is limited to Bulkmatic's violation of 49 C.F.R. § 376.12(d). Count III also alleges that Bulkmatic violated 49 C.F.R. § 376.12(g). However, there is a genuine issue of material fact with respect to whether Bulkmatic provides owner-operators with copies of freight bills or freight invoices upon request. Accordingly, to the extent that plaintiffs seek summary judgment on Count III for Bulkmatic's violation of 49 C.F.R. § 376.12(g), that portion of plaintiffs' motion is denied.

Count III of the complaint is denied.

**III.    Bulkmatic's Motion for Summary Judgment On Counts I and II**

Bulkmatic's argument with respect to Counts I and II hinges on their theory that Bulkmatic properly compensated its owner-operators.  Bulkmatic argues that summary judgment is warranted on Counts I and II because plaintiffs cannot show any damages resulting from the technical violations they allege.

The parties have not briefed the issue of the amount of damages plaintiffs suffered as a result of Bulkmatic's violation of § 376.12(d).  That issue is a matter for another day.  However, based on the undisputed facts submitted in connection with the parties' cross-motions for summary judgment, it is clear that plaintiffs have sustained some damages here.  Indeed, Bulkmatic concedes that it calculates owner-operator compensation as a percentage of the amount billed to the shipper that is attributable to the use of the owner-operators' equipment and driver services.  Bulkmatic also admits that it does not compensate owner-operators for accessorial services performed by Bulkmatic employees or by third parties that do not involve the use of owner-operators' driving services or equipment.  Instead, Bulkmatic excludes those amounts from gross revenue prior to calculating owner-operator compensation.

As discussed above, the Lease does not state that owner-operator compensation is limited to a percentage of revenues generated from their equipment and driver service.  Likewise, the Lease does not specifically provide for a reduction of gross revenue prior to calculating owner-operator compensation for items enumerated in section E or section F.  Based on this Court's interpretation of the Lease, particularly our interpretation of "gross revenue," the undisputed facts demonstrate that plaintiffs have

20

not been properly compensated.  Accordingly, Bulkmatic's motion for summary

judgment on Counts I and II of plaintiffs' complaint is denied.

Finally, Bulkmatic asks this Court to enter summary judgment in its favor on

Count II of plaintiffs' complaint.  Like Count III, Count II alleges that Bulkmatic violated

49 C.F.R. § 376.12(g) because Bulkmatic failed to provide the owner-operators with

rated freight bills or other forms of freight documentation upon request.  Bulkmatic

argues that it substantially complied with this regulation by providing plaintiffs with

settlement statements.  Assuming for purposes of this discussion that the substantial

compliance standard applies here, the Court cannot conclude at this juncture that the

settlement statements constitute substantial compliance with § 376.12(g).  Furthermore,

as discussed above, a question of fact exists with respect to whether Bulkmatic

provides owner-operators with copies of freight bills or freight invoices upon request.

Accordingly, for this additional reason, Bulkmatic's motion for summary judgment on

Count II is denied.

**CONCLUSION**

For the reasons set forth above, plaintiffs' motion for partial summary judgment as to liability on Count III is granted. Defendant's cross-motion for summary judgment is denied. It is so ordered.

**ENTER:**

_Michael Mason_
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated:** **August 3, 2007**